*Shelia Davis et al. v. Frostburg Facility Operations, LLC d/b/a Frostburg Village*, No. 12, September Term, 2017, Opinion by Adkins, J.

**HEALTH — MARYLAND HEALTH CLAIMS ACT — CONDITIONS PRECEDENT:** Claimant alleging medical injuries was required to file such claims in the Maryland Health Care Alternative Dispute Resolution Office ("ADR Office") pursuant to the Maryland Health Claims Act. Because the statute of limitations barred Claimant from filing in the ADR Office, the Court of Appeals allowed only her claims for non-medical injuries to proceed in the trial court.

Circuit Court for Allegany County
Case No.: 01-C-14-041332
Argued: October 5, 2017

IN THE COURT OF APPEALS

OF MARYLAND

No. 12

September Term, 2017

SHELIA DAVIS et al.

v.

FROSTBURG FACILITY OPERATIONS, LLC
d/b/a FROSTBURG VILLAGE

Barbera, C.J.
Greene
Adkins
McDonald
Watts
Hotten
Getty,

JJ.

Opinion by Adkins, J.

Filed: January 19, 2018

We must decide, once again, whether claims for negligence and related claims have alleged a "medical injury" within the meaning of the Health Care Malpractice Claims Act ("Health Claims Act" or "HCA"). Md. Code (1974, 2013 Repl. Vol.), §§ 3-2A-01, et seq. of the Courts and Judicial Proceedings Article ("CJP"). Petitioners Shelia Davis and her husband Robert Davis, sued Frostburg Facility Operations, LLC ("Frostburg") for injuries Ms. Davis allegedly sustained while staying at one of Frostburg's facilities. If the plaintiffs alleged a medical injury within coverage of the Health Claims Act, they were required to file those claims in the Health Care Alternative Dispute Resolution Office ("ADR Office") as a condition precedent to their action in the Circuit Court for Allegany County. If not, the plaintiffs were free to file their claim as a non-medical negligence suit in the Circuit Court.

We issued a writ of certiorari to consider two questions, which we have rephrased for clarity:[1]

> 1. Did the trial court err in dismissing Petitioners' claims for failure to first file in the ADR Office?

---

[1] Petitioner presented the following questions in her Petition for Writ of Certiorari:

> 1. Did the Court of Special Appeals err in holding that Petitioner was required to file in the Maryland Healthcare Dispute Resolution Office so that office could make the initial determination of whether Petitioner's injuries were the result of ordinary negligence or medical negligence?
>
> 2. Did the Court of Special Appeals err in holding that Petitioners' complaint was not sufficient on its face to survive the granting of a motion to dismiss on the remaining counts?

2.  Did the trial court properly dismiss the remainder of the Complaint?

We hold that two of Davis's counts alleged medical injuries within the HCA, and the trial court properly dismissed those counts. The remaining negligence count did not allege a breach of a professional standard of care, and should survive. The counts sounding in Contract, Consumer Protection, and Loss of Consortium also survive dismissal.

## I. BACKGROUND

Petitioners, Shelia Davis and her husband Robert Davis, filed a Complaint against Frostburg Facility Operations, LLC ("Frostburg") in the Circuit Court for Allegany County. Davis complained of injuries suffered during her stay at Frostburg's nursing care facility while recovering from back surgery. Her alleged injuries followed two separate accidents at Frostburg. First, while she slept, she fell from her bed—allegedly as a result of Frostburg's failure to properly secure her mattress to the bed frame. Davis waited on the floor approximately 45 minutes for a nurse to assist her. When she finally arrived, the nurse retrieved a mechanical lift and used that to raise Davis off the floor, intending to return her smoothly to the bed. But, in another mishap—while Davis was suspended, but not yet over her bed—the lift released and dropped her again onto the hard surface of the floor.

These events occurred on October 26, 2011. Davis[2] filed her Complaint on October 23, 2014—just three days before Maryland's general statute of limitations would have barred her claim. CJP § 5-101.[3] Frostburg responded with a Motion to Dismiss.

Frostburg argued that Davis's claims failed as a matter of law because she did not file her claims in the ADR Office pursuant to CJP § 3-2A-04(a)(1)(i). Frostburg also moved to dismiss Davis's claims for breach of contract and violation of the Maryland Consumer Protection Act ("CPA") for failure to state a claim for which relief can be granted. Before the trial court could rule on Frostburg's motion, Davis filed an Amended Complaint pursuant to Maryland Rule 2-341. Frostburg renewed its Motion to Dismiss, contending that Davis failed to remedy the deficiencies in her Complaint. Before the trial court ruled on Frostburg's motion, Davis filed a Second Amended Complaint—the subject of this appeal.

Davis amended her factual allegations to emphasize the non-medical nature of her claims. Specifically, she alleged that the Frostburg facility also served as a "residence" during her stay there. She averred that she was not receiving medical services when her mattress came loose, causing her first fall to the floor, or when she was dropped by the

---

[2] Although both Shelia and Robert Davis filed the Complaint for convenience we shall refer to the plaintiffs in the singular and simply as "Davis."

[3] The statute of limitations for a claim against a health care provider also expired just three days after Davis filed her complaint. *See Swam v. Upper Chesapeake Med. Ctr.*, 397 Md. 528, 534 (2007) ("Section 5–109(a) [of the Courts and Judicial Proceedings ("CJP") Article] requires that claims be filed with the Health Care Office within the earlier of '(1) Five years of the time the injury was committed; or (2) Three years of the date the injury was discovered.'").

3

nurse in an effort to return Davis to the bed. Regarding the first fall, Davis alleged that she was "simply lying in bed." As to the second fall, Davis similarly alleged that her injuries resulted after the nurse "simply attempt[ed] to return [her] to her bed." Her Complaint included six Counts entitled: (1) Negligence; (2) Negligence; (3) Negligence *Respondeat Superior*; (4) Breach of Contract; (5) "False Advertising/Consumer Protection;" and (6) Loss of Consortium.

Count One related solely to Davis's initial fall from her bed as she slept. She alleged that Frostburg owed her "the duty to exercise reasonable care in providing a bed to her that was safe for ordinary use." Frostburg breached this duty by "negligently and recklessly failing to properly attach Ms. Davis's mattress to the bed frame . . . ." Count Two related solely to her fall from the mechanical lift as the nurse attempted to return her to the bed. Davis alleged that Frostburg owed her "the duty to exercise reasonable care in providing mechanical lifts . . . that were safe for ordinary use," but breached this duty by "negligently and recklessly providing a mechanical lift that malfunctioned . . . ." Count Three, for Negligence *Respondeat Superior*, also related only to Davis's fall from the mechanical lift. Davis alleged that Frostburg had a duty "to exercise reasonable care in returning her to her bed." The nurse, a Frostburg employee acting in the scope of employment, "negligently and recklessly released Ms. Davis from the mechanical lift . . . ." Davis also alleged—in Counts One, Two, and Three—that her injuries did not result from Frostburg's rendering or failure to render health care. Arguing that Davis's claims sounded in medical malpractice, Frostburg moved to dismiss the Second Amended Complaint because Davis

4

failed to satisfy the "condition precedent" of filing her claims in the ADR Office according to CJP § 3-2A-04(a)(1)(i).

After the trial judge granted Frostburg's Motion to Dismiss, Davis timely appealed. In an unreported opinion, the Court of Special Appeals affirmed the trial court's decision to dismiss the entire complaint. *Davis v. Frostburg Facility Operations, LLC*, No. 540, 2017 WL 383454 (Md. Ct. Spec. App. Jan. 27, 2017). The intermediate appellate court affirmed dismissal of Davis's negligence claims and concluded that they alleged a "medical injury" within the HCA. *Id.* at \*5–6. The Court also affirmed dismissal of Davis's remaining claims because they were too closely related to claims subject to the HCA. *Id.* at \*6–7.

## II. DISCUSSION

Davis makes two arguments before this Court. First, she argues that the Complaint did not set forth claims of medical negligence and, therefore, the trial court improperly dismissed her Complaint for failure to first file in the ADR Office. Second, Davis contends that the trial court also improperly dismissed the remaining counts of her Complaint for a failure to state a claim upon which relief can be granted.

The standard of review of the grant or denial of a motion to dismiss is whether the trial court was legally correct. *RRC Ne., LLC v. BAA Maryland, Inc.*, 413 Md. 638, 643–44 (2010). In reviewing the ruling on the motion to dismiss, "we accept all well-pled facts in the complaint, and reasonable inferences drawn from them, in a light most favorable to the non-moving party." *Converge Servs. Grp., LLC v. Curran*, 383 Md. 462, 475 (2004). When examining the pertinent facts, the Court limits its analysis to the "four corners of the

5

complaint . . . ." *State Ctr., LLC v. Lexington Charles Ltd. P'ship*, 438 Md. 451, 497 (2014) (cleaned up).[4] The pleader must set forth a cause of action with sufficient specificity—"'bald assertions and conclusory statements by the pleader will not suffice.'" *Id.* (quoting *RRC Ne.*, 413 Md. at 644).

Frostburg contends that Davis has alleged a breach of a professional standard of care and should have first filed her claims in the ADR Office as required by CJP § 3-2A-04(a)(1)(i). The General Assembly enacted this statute as one part of the Health Claims Act. An analysis of the HCA and the General Assembly's objective in enacting the legislation provides a helpful guidepost as we navigate whether the trial court properly dismissed Davis's claims.

The General Assembly adopted the Health Claims Act as a process for weeding out meritless claims and resolving disputes involving medical care. In the mid-1970s, Maryland's medical care providers faced a malpractice insurance shortage. *See, e.g., St.*

---

[4] The Court of Special Appeals explained the use of this new "cleaned up" parenthetical:

> "Cleaned up" is a new parenthetical intended to simplify quotations from legal sources. *See* Jack Metzler, Cleaning Up Quotations, J. App. Prac. & Process (forthcoming 2018), https://perma.cc/JZR7-P85A. Use of (cleaned up) signals that to improve readability but without altering the substance of the quotation, the current author has removed extraneous, non-substantive clutter such as brackets, quotation marks, ellipses, footnote signals, internal citations or made un-bracketed changes to capitalization.

Chassels v. Krepps, __ Md. App. __ n.3, 2017 WL 5989052, at *3 n.3 (Md. Ct. Spec. App. Dec. 4, 2017).

*Paul Fire & Marine Ins. Co. v. Ins. Comm'r*, 275 Md. 130, 132–33 (1975). The General

Assembly enacted the HCA to encourage insurance carriers to provide coverage for

Maryland physicians. *See Attorney General v. Johnson*, 282 Md. 274, 280–81 (1978)

*overruled on other grounds by Newell v. Richards*, 323 Md. 717, 734 (1991). The

legislation created a claim arbitration system requiring all plaintiffs alleging a medical

injury to submit an expert certification of the claim before the case could go forward. *See*

*id.* at 277, 279–80. The HCA's purpose "is to screen malpractice claims, ferret out

meritless ones, and, in theory, thereby lower the cost of malpractice insurance and the

overall costs of health care." *Adler v. Hyman*, 334 Md. 568, 575 (1994).

The HCA sets out several requirements for a malpractice plaintiff. A plaintiff

claiming a "medical injury" committed by a "health care provider" and more than $30,000

in damages must first file their claims with the ADR Office. CJP § 3-2A-02(a)(1). The

HCA defines "medical injury" as an "injury arising or resulting from the rendering or

failure to render health care." *Id.* § 3-2A-01(g). A "health care provider" means:

> a hospital, a related institution as defined in § 19-301[5] of the
> Health-General Article, a medical day care center, a hospice

---

[5] Md. Code (1982, 2015 Repl. Vol.), § 19-301(o) of the Health-General Article
("HG") provides the following definition of a "related institution:"

> (1) "Related institution" means an organized institution,
>     environment, or home that:
>     (i)    Maintains conditions or facilities and equipment
>            to provide domiciliary, personal, or nursing care
>            for 2 or more unrelated individuals who are
>            dependent on the administrator, operator, or
>            proprietor for nursing care or the subsistence of
>            daily living in a safe, sanitary, and healthful
>            environment; and

7

care program, an assisted living program, a freestanding ambulatory care facility as defined in § 19-3B-01[6] of the Health-General Article, a physician, an osteopath, an optometrist, a chiropractor, a registered or licensed practical nurse, a dentist, a podiatrist, a psychologist, a licensed certified social worker-clinical, and a physical therapist, licensed or authorized to provide one or more health care services in Maryland.

*Id.* § 3-2A-01(f)(1) (footnotes added).

Once filed in the ADR Office, the claim is subject to non-binding arbitration. *Id.* § 3-2A-04. We characterize this arbitration as non-binding because the plaintiff, or any other party, may unilaterally waive the arbitration requirement after meeting certain conditions outlined in the statute. *Id.* § 3-2A-06B.

A plaintiff must also file, within 90 days of initially submitting a claim, an expert certification of the claim before unilateral waiver is permitted. *Id.* § 3-2A-04(b)(1)(i). The claims certification must include a report prepared by the same expert. This requirement reflects the General Assembly's desire to root out "nonmeritorious medical malpractice claims." *D'Angelo v. St. Agnes Healthcare Inc.*, 157 Md. App. 631, 645 (2004). The

---

(ii)    Admits or retains the individuals for overnight care.

(2) "Related institution" does not include a nursing facility or visiting nurse service that is conducted only by or for adherents of a bona fide church or religious organization, in accordance with tenets and practices that include reliance on treatment by spiritual means alone for healing.

[6] HG 19-3B-01(c) defines a "freestanding ambulatory care facility" as "(1) [a]n ambulatory surgical facility; (2) [a] freestanding endoscopy facility; (3) [a] freestanding facility utilizing major medical equipment; (4) [a] kidney dialysis center; or (5) [a] freestanding birthing center."

expert certification requirement can also assist the parties in evaluating the merits of health claims and defenses. *Walzer v. Osborne*, 395 Md. 563, 583–84 (2006).

Once the expert certification is filed, either party can make a speedy exit from the ADR process. CJP § 3-2A-06B(b)(1). Indeed, most claimants elect to proceed to circuit court after satisfying compliance with the expert certification and report requirement.[7] *See* A. Thomas Pedroni & Ruth F. Vadi, *Mandatory Arbitration or Mediation of Health Care Liability Claims?*, 39 Md. B. J. 54, 56 (Mar./Apr. 2006) ("The vast majority of current medical malpractice cases go directly to circuit court in this system."). Despite this unilateral waiver provision, the General Assembly, in passing the HCA, sought to maximize the number of claims submitted to binding arbitration. *Id.* (citing *Carrion v. Linzey*, 342 Md. 266, 287 (1996)).

We first considered the scope of the HCA, and whether a claim must be submitted to arbitration in *Cannon v. McKen*, 296 Md. 27 (1983).[8] Cannon suffered severe injuries while at her dentist's office. Dr. McKen owned the building that housed his dental practice.

---

[7] If no party elects to unilaterally waive arbitration, the arbitration process continues. Cases continuing into arbitration are decided by a panel consisting of: an attorney, a health care provider, and a public member. Md. Code (1974, 2013 Repl. Vol.), § 3-2A-04(c) of the Courts and Judicial Proceedings Article. Panel members are selected at random from a listing of qualified arbitrators maintained by the Director of the ADR office. *Id.* § 3-2A-04. If the parties accept the panel's decision or award, it becomes binding and final. *Id.* § 3-2A-05(h). Either party can, in the alternative, contest the award by filing an action in circuit court within 30 days. *Id.* § 3-2A-06(a).

[8] This Court also issued a decision regarding the scope of the HCA in *Oxtoby v. McGowan*, 294 Md. 83 (1982). That case, however, examined whether claims arising from medical injuries before the effective date of the HCA also fell within the scope of the Act. *Id.* at 90–92. We held that the HCA did not apply to such claims. *Id.* at 99.

As Cannon sat in an examination chair, a large piece of x-ray equipment fell off the wall upon which it was mounted and struck her in the head and face. Cannon filed several claims against Dr. McKen. *Id.* at 29.

Specifically, Cannon alleged:

> Defendant McKen had contracted for the design and construction of structural improvements to his residence to be used as a dental office. This office included a dental chair and/or x-ray equipment wall attachment, which equipment was used by plaintiff Gloria Cannon on or about October 28, 1978 in her capacity as a dental patient of defendant McKen.

*Id.* Regarding the standard of care, Cannon asserted that Dr. McKen "owed a duty to exercise reasonable care in offering equipment in his dental office for safe and secure use by his patients." *Id.* Dr. McKen breached this duty of care in that:

> [T]he condition of the dental chair and/or x-ray equipment wall attachment was not safe for use by plaintiff Gloria Cannon, on or about October 28, 1978. While the plaintiff was sitting in this dental chair, a part of the chair and/or x-ray wall attachment broke loose and fell on her, striking her on the face and head. Plaintiff also relies on the doctrine of *res ipsa loquitur*.

*Id.*

We found ambiguity in CJP § 3-2A-01(f)'s definition of "medical injury" and proceeded to set out the necessary characteristics of a medical claim covered by the HCA. *Id.* at 32. The trial judge defined "medical injury" in the context of health care:

> I have defined health care as meaning once you establish the relationship of patient and health care provider; once you establish that relationship, in my judgment, does it make any difference how there is a breach. They could slip on a floor or trip over the chair, or it may be inadequate lighting, or they can drop you from the operating table or do a lot of things. Once

10

> you establish that relationship in my judgment it has to be arbitrated.

*Id.* at 37. We rejected this interpretation of the statute as overly broad, and instead held that the HCA only covers those claims that "arise or result from the breach of a professional's duty to exercise the appropriate care required of a health care provider in a professional capacity." *Id.*

We remanded Cannon's claims for further pleading in the trial court. The pleadings were "too sparse to allow a determination whether Mrs. Cannon's injury arose because of the defendant's breach of his professional duty owed her or because of a breach of duty which he may have owed her as a premises owner or in some other non-professional capacity." *Id.* at 37–38. Likewise, Dr. McKen had not succeeded in showing that the plaintiff had alleged a breach of a professional duty. We relied upon the long-held rule that, where a cause of action depends on satisfaction of a condition precedent, the plaintiff "must allege performance of such condition or show legal justification for nonperformance." *Id.* at 38 (citing *Engle v. Mayor & City Council of Cumberland*, 180 Md. 465 (1942)).

We again examined the scope of the HCA in *Nichols v. Wilson*, 296 Md. 154 (1983). *Nichols* involved claims that greatly differed from the plaintiff's claims in *Cannon*. Nichols sued Dr. Wilson for injuries suffered by her daughter. The younger Nichols went to Dr. Wilson for a suture removal procedure. Alleging that Dr. Wilson slapped her daughter across the face with an open palm, Nichols filed a three-count complaint for assault and battery, negligence, and intentional infliction of emotional distress. *Id.* at 155

11

n.2. We reiterated our understanding of the coverage of the HCA: "[I]t is only those claims for damages where there has been a violation of the health care provider's professional duty to exercise care which are within the [Health Claims] Act." *Id.* at 161. The Legislature did not intend for the HCA to cover the intentional torts of assault and battery or intentional infliction of emotional distress, even if such actions occurred while a physician rendered health care.[9] *Id.*

The Court took a more expansive view of the HCA's jurisdiction in *Jewell v. Malamet*, 322 Md. 262 (1991), involving allegations of assault during a medical exam. There the plaintiff alleged that she suffered injuries from intentional torts committed by a physician who sexually battered and assaulted her during a medical examination. *Id.* at 267–69. The plaintiff did not file her claim in the ADR Office, but instead proceeded directly to the trial court. The defendant physician contended that the allegedly injurious conduct was part of a legitimate medical examination and the dispute required further investigation of the professional standard of care. *Id.* at 275. **Determining whether a claim falls under the HCA depends on "the factual context in which the tort was allegedly committed."** *Id.* at 271–72 (emphasis added). Ultimately, we ruled for the physician, dismissing the complaint—because we could not conclude "that the claims set out were not for medical injury . . . ." *Id.* at 274–75.

---

[9] We qualified our holding by noting "[w]e do not mean hereby to indicate that all intentional torts of a professional nature are not covered by the [Health Claims] Act as there may well be many such acts that would be so covered." *Nichols v. Wilson*, 296 Md. 154, 161, n.5 (1983). At that time, we did not expand upon which claims "would be so covered."

The plaintiff fared no better in *Goicochea v. Langworthy*, 345 Md. 719 (1997), another physician case. Following a hernia examination conducted by Dr. Goicochea, Langworthy complained of persistent pain and discomfort in his groin area. *Id.* at 722. He sued Dr. Goicochea for assault and battery. The trial court dismissed the complaint after clarifying that the plaintiff's factual allegations failed to demonstrate that the plaintiff's claims arose from conduct during the provision of medical care and fell beyond the HCA. *Id.* at 723. We reiterated that the proper initial forum for a claim "depends upon the **factual context** in which the tort was allegedly committed." *Id.* at 728. If a claimant's injury "resulted from conduct completely lacking in medical validity in relation to the medical care rendered, the [HCA] is inapplicable, and the action may proceed without first resorting to arbitration." *Id.* We affirmed dismissal because the plaintiff had failed to plead any factual basis upon which the trial court could properly conclude that the physician's actions had "no conceivable medical validity." *Id.* at 729.

Injury in a hospital setting does not always dictate that a claim will be covered by the HCA. In *Afamefune v. Suburban Hosp., Inc.*, 385 Md. 677, 679–80 (2005), we examined whether filing in the ADR Office was mandated when a psychiatric patient claimed negligence against a hospital after she suffered an assault, rape, or attempted rape by another patient at the hospital. We concluded it was not—because the plaintiff's claims did not allege either a breach of a professional standard of care or that her injuries occurred during the rendering of medical care. *Id.* at 694. We also rejected the hospital's overbroad argument that the HCA should apply simply because the plaintiff was under the care of a medical provider when she was injured. We reaffirmed our earlier cases holding that—for

13

the HCA to apply—the cause of an injury must have been "'a breach by the defendant in his, her or its professional capacity, of the duty to exercise . . . professional expertise or skill' in rendering or failing to render medical care." *Id.* at 695 (quoting *Cannon*, 296 Md. at 36) (cleaned up).

A plaintiff suing a hospital also successfully bypassed the Health Claims Office in *Swam v. Upper Chesapeake Med. Ctr., Inc.*, 397 Md. 528 (2007). This hospital visitor alleged that she was stuck by a hypodermic needle when she placed her hand on a counter in a waiting room adjacent to an operating room, while waiting for her parent who was in surgery. *Id.* at 531–32. Although the *Swam* opinion primarily examined whether filing in the ADR Office tolled Maryland's three-year statute of limitations on civil actions generally, we also considered whether the plaintiff suffered a "medical injury" within the HCA. *Id.* at 535–39. We held that the plaintiff's injuries fell outside of the HCA because the complaint alleged negligence relating "to the disposal of medical waste and not to medical treatment." *Id.* at 539. Once again, this Court emphasized the importance of the factual context of the plaintiff's allegations when determining whether the plaintiff's claims were subject to the HCA. *Id.* at 537.

These cases, in sum, instruct that for the HCA to apply, a plaintiff must allege a breach of a professional duty of care during the rendering of medical care. *See, e.g.*, *Afamefune*, 385 Md. at 695. When applying this test, the Court looks to the factual circumstances and context of a plaintiff's claims, not merely to the type of claim or the character of the defendant. *See, e.g.*, *Goicochea*, 345 Md. at 728.

## A Theory Permeating Frostburg's Argument

Permeating several of Frostburg's arguments is its theory—asserted as a matter of law—that the proper forum for filing "close" claims—that is, claims that might involve allegations of medical malpractice—is the ADR Office. Frostburg cites *Swam* to support this "rule of law." In *Swam*, the plaintiff filed her claims first in the ADR Office. After filing the certificate and report of an expert, the plaintiff elected to waive arbitration and the ADR Office transferred her case to the trial court. The defendant moved for summary judgment on the ground that the complaint before the trial court was time barred by the statute of limitations for civil actions. *Swam*, 397 Md. at 533. On appeal, we explained that "the proper forum for the filing of a borderline medically-related claim may not always be apparent." *Id.* at 541. We referenced the ADR Office's authority to decide close claims not—as Frostburg asserts—as a restriction on a trial court's ability to do the same, but in recognition of the difficulty a plaintiff might face in selecting the proper forum. With the understanding that it might not always be apparent that a plaintiff can file in circuit court, we held that the initial filing in the ADR Office tolled the three-year general statute of limitations. *Id.* at 544.

Frostburg's "close case" theory also ignores *Cannon*, which instructs that trial courts can assess a complaint and determine whether a plaintiff should have first filed in the ADR Office. Because the complaint in *Cannon* did not clearly allege claims beyond the HCA, we remanded for further pleading. 296 Md. at 38–39. Our decision to remand gave the trial court another opportunity to assess whether the plaintiff alleged a "medical injury" within the HCA.

15

The cases discussed above are inconsistent with Frostburg's proposed rule that all "close cases" must be submitted to the ADR Office. We conclude that a trial judge has the discretion, and the capability, to decide whether a complaint sets forth a breach of a professional standard of care such that it must be filed in the ADR Office.

**Davis's Claims**

Davis alleged that she was negligently injured as a result of Frostburg's negligence on two separate occasions: when she fell from her bed, and when she was dropped while staff attempted to return her to the bed. Frostburg contends that each of these injuries stem from a breach of a professional duty of care. Davis alleged three counts of negligence that we discuss in turn.

*Count One—Negligence*

In Count One of her Complaint, Davis alleged that she was sleeping and not receiving any medical services when the mattress on her bed detached and caused her to fall. In Maryland, a plaintiff must prove four elements to prevail in a claim of negligence: 1) the defendant owed the plaintiff a **duty** to conform to a certain standard of care; 2) the defendant **breached** this duty; 3) actual **loss or damage** to the plaintiff; and 4) the defendant's breach of the duty **proximately caused** the loss or damage. *See, e.g.*, *Schultz v. Bank of America, N.A.*, 413 Md. 15, 27 (2010). Our cases interpreting the HCA require consideration of whether a plaintiff has alleged a breach of a **professional** standard of care. Accordingly, our examination of the applicability of the HCA turns on an analysis of Davis's allegations regarding Frostburg's duty of care.

16

Unlike the plaintiffs in *Jewell* and *Goicochea*, who both alleged that their injuries occurred during medical treatment or examinations, Davis alleged that she was merely asleep when she fell. The plaintiff in *Jewell* alleged an injury during a medical examination conducted by a rheumatologist. 322 Md. at 267–69. We required the plaintiff to file in the ADR Office because the parties disputed the nature of the allegedly harmful conduct. *Id.* at 274–75. The plaintiff argued that the doctor's actions amounted to sexual assault and battery, yet the doctor contended that the actions were part of a legitimate medical examination. *Id.* In *Jewell*, we approved of a trial court's conclusion that the ADR Office should weigh whether "there has been a violation of [the] doctor's **duty** to exercise care." *Id.* at 271 (emphasis added). The plaintiff in *Goicochea* also contended that he was injured following a medical examination. 345 Md. at 722. We also required submission to the ADR Office in *Goicochea* because "the plaintiff allege[d] that he . . . was injured by a health care provider during the rendering of medical treatment or services . . . ." *Id.* at 728.

Davis did not allege that her fall from the bed resulted from the rendering of medical care. As alleged, no medical professional was even present at the time the injury occurred. Thus, her alleged injuries differed from *Jewell* and *Goicochea* in that both of those plaintiffs' claims required a trier of fact to consider a professional standard of care. Here, though, Davis's first count does not require the fact finder to understand any professional standard of care. Claims merely for ordinary negligence fall beyond the scope of the HCA. *Swam*, 397 Md. at 539.

In *Jewell* and *Goicochea*, we also observed that expert testimony would be necessary to help the juries decide whether the defendants' conduct fell outside the scope

of normal medical treatment. Frostburg does not explain—and we do not see—how an expert medical witness would be helpful in this case to explain why a mattress would detach itself from a bed frame.

To be sure, Davis's appeal differs in at least one respect from several of our previous cases considering the applicability of the HCA: she did not allege the commission of any intentional torts. *See Nichols*, 296 Md. at 155 n.2 (battery and intentional infliction of emotional distress); *Jewell*, 322 Md. at 267–69 (sexual battery and assault); *Goicochea*, 345 Md. at 722 (assault and battery). *But see Afamefune*, 385 Md. at 680–81 (negligence); *Swam*, 397 Md. at 539 (negligence). Instead, Davis sued for negligence, breach of contract, and violations of the CPA. Frostburg contends that the absence of an alleged intentional tort brings Davis's claims within the HCA. We do not agree. Just as the allegations of intentional torts did not remove the claims from coverage under the HCA in *Jewell* and *Goicochea*, allegations of non-medical negligence will not automatically bring a claim within the Act. *Id*.

For these reasons, the trial court and the Court of Special Appeals erred in holding that Count One of Davis's Complaint set forth a claim within the HCA.

*Count Two—Negligence*

In Count Two of Davis's Complaint, she alleged that Frostburg negligently and recklessly provided "a mechanical lift that malfunctioned and released [her] before [she] was over the bed, causing [her] to be dropped from the height of the bed back to the floor." Frostburg again contends that Davis has alleged a medical injury which would bring her claims under the umbrella of the HCA.

18

We apply the same principles discussed *supra* to determine whether Davis alleged a medical injury in Count Two. Davis attempted to label her claims as ordinary negligence by declaring the "injuries alleged herein did not result from the Defendant's rendering of healthcare or failing to render healthcare." But in *Goicochea*, we rejected a plaintiff's attempt to characterize claims—by mere labeling—in a way that would avoided application of the HCA. *Goicochea*, 345 Md. at 729 ("A plaintiff may not remove a medical malpractice action from the ambit of the statute simply by adding the adjectives 'malicious' or 'willful.'"). Unlike *Nichols*, in which the plaintiff claimed to have been slapped by a physician during a medical procedure, Davis did not set forth claims that in "no way" can be read as within the Act. *Jewell*, 322 Md. at 274 (*quoting Nichols*, 296 Md. at 161).

Just as the claims in *Jewell* and *Goicochea* required a detailed consideration of medical standards of care—particularly medical procedures—we conclude that Davis's claims regarding her fall from the mechanical lift also require a detailed examination of what can only be described as medical procedures. Davis's Complaint alleges that the nurse informed her that Frostburg was a "no-lift facility." Frostburg's status as a "no-lift facility," the meaning of that term, and its impact on patient care, requires an examination of professional standards of care similar to the claims in *Jewell* and *Goicochea*. Davis alleged that Frostburg "negligently and recklessly" provided a mechanical lift "that malfunctioned." Here too, an examination of medical procedures regarding the proper operation of the lift—and whether the nurse properly followed these procedures—will be necessary to decide the veracity of this claim. These circumstances are indistinguishable

19

from *Jewell* and *Goicochea*. Therefore, Davis's claims in Count Two of her Complaint should have been filed in the ADR Office.

*Count Three—Negligence Respondeat Superior*

*Respondeat superior* is "a means of holding employers . . . vicariously liable for the tortious conduct of an employee acting within the scope of his/her employment." *Serio v. Baltimore Cty.*, 384 Md. 373, 397–98 (2004). A successful *respondeat superior* claim, will impose joint and several liability on the employer for the tortious conduct of an employee. *See, e.g., S. Mgmt. Corp. v. Taha*, 378 Md. 461, 481 (2003). To be considered within the scope of employment, the employee's acts "must have been in furtherance of the employer's business and authorized by the employer." *Id.* Count Three alleges that Frostburg "negligently and recklessly" released Davis from the mechanical lift. According to the Complaint, Frostburg's employee had "never operated" the mechanical lift used on the night of her injuries.

Count Three can fare no better than Count Two—because proof of the employee nurse's negligence in operating the mechanical lift is a prerequisite to proving a claim for *respondeat superior*. *See, e.g., Barclay v. Briscoe*, 427 Md. 270, 282–83 (2012). Therefore, Davis's third count of negligence *respondeat superior* should have been filed in the ADR Office before filing in the Circuit Court. The Court of Special Appeals properly affirmed dismissal of Davis's *respondeat superior* claim.

**Closely Related Claims**

According to the intermediate appellate court, Davis's remaining claims—for breach of contract (Count Four), Consumer Protection Act violation (Count Five) and Loss

of Consortium (Count Six)—were too closely related to the negligence claims, which that Court concluded were subject to the HCA. *Davis*, 2017 WL 383454 at *6–7.[10] The Petition for Writ of Certiorari framed the second issue in the following way:

> "Did the Court of Special Appeals err in holding that Petitioners' Complaint was not sufficient on its face to survive the granting of a motion to dismiss on the remaining counts?"

But this question mischaracterizes the holding from the Court of Special Appeals. The intermediate appellate court affirmed dismissal of the entire Complaint relying solely on the grounds that the remaining claims were too closely related to those subject to the HCA. *Id.* at *7. We need only address, then, whether this "closely related" rationale for dismissal is valid.

We agree with the Court of Special Appeals and its conclusion that, generally, claims closely related to a claim subject to arbitration under the HCA should also be filed in the ADR Office to avoid piecemeal litigation. *See Nichols*, 296 Md. at 158–59 (Consistent with the principle of the efficient administration of justice and to avoid piecemeal litigation, if one count is subject to arbitration, all closely related claims must also be submitted to the ADR Office). As explained in *Nichols*, situations in which a plaintiff might maintain actions in a trial court and the ADR Office were undesirable

---

[10] Presumably, the Circuit Court dismissed Count Six, Loss of Consortium, for the same reason. Because we have revived one of Davis's negligence claims, we also hold that Davis's loss of consortium claim may go forward. *See Deems v. W. Maryland Ry. Co.*, 247 Md. 95, 115 (1967) ("[W]hen either husband or wife claims loss of consortium by reason of physical injuries sustained by the other as the result of the alleged negligence of the defendant, that claim can only be asserted in a joint action for injury to the marital relationship.").

21

because they could result in dueling or inconsistent results—and force medical providers to defend two actions originating from the same conduct. *Id.*

But Davis can no longer maintain her professional negligence claims in the ADR Office because her injuries occurred in 2011, and the three-year statute of limitations has expired. *See* CJP § 5-109(a) ("An action for damages for an injury arising out of the rendering of or failure to render professional services by a health care provider . . . shall be filed within . . . [t]hree years of the date the injury was discovered."); *Swam*, 397 Md. at 534 (recognizing the same). Thus there is no potential for piecemeal litigation if we allow Davis to pursue her remaining claims at the trial court. Accordingly, we hold that the Court of Special Appeals improperly dismissed these claims.[11]

### III. CONCLUSION

In sum, we hold that Count One of Davis's Complaint did not allege a medical injury within the HCA, while Counts Two and Three did allege a medical injury. Our decision to dismiss Davis's lawsuit as it relates to the medical professional negligence—Counts Two and Three—and only revive the non-medical Counts—One, Four, Five, and Six—presents no danger of piecemeal resolution of her controversy. Her only viable negligence claim, as of our decision today, is for injuries stemming from Frostburg's ordinary negligence in failing to properly secure a mattress to a bed frame.

---

[11] We do not consider the sufficiency of Davis's pleading on the claims sounding in Contract or Consumer Protection. These issues should be addressed in the trial court on remand.

Accordingly, we reverse the Court of Special Appeals as to Counts One, Four, Five and Six, and hold that these Counts may proceed in Circuit Court.  We affirm as to Counts Two and Three.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED IN PART AND REVERSED IN PART; CASE REMANDED TO THAT COURT WITH DIRECTIONS TO REVERSE IN PART THE JUDGMENT OF THE CIRCUIT COURT FOR ALLEGANY COUNTY AND REMAND THE CASE TO THAT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.  COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY PETITIONERS AND RESPONDENT EQUALLY.**